GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff

v.

HENRY KNIGHT, Defendant

Criminal No. 1990-131

District Court of the Virgin Islands

Div. of St. Croix

October 7, 1991

TERRY HALPERN, United States Attorney, By: JAMES M. PETERS, Assistant U.S. Attorney, Christiansted, St. Croix, V.I., *for plaintiffs*

C. VERNON MASON, *counsel for defendant*, By: AMELIA JOSEPH, Christiansted, St. Croix, V.I., *co-counsel for defendant*

BROTMAN, *Acting Chief Judge*

This case is before the court on defendant's notice of his intention to rely on an insanity defense filed on the eve of trial on September 30, 1991, motion for reconsideration to allow the use of the excusable homicide defense in his opening statement, and reconsideration on the use of evidence of the victim's prior crimes. The government moved to strike the insanity defense as untimely and has also filed a motion for the determination of the question of whether the defendant is entitled to jury instructions on the lesser included offense of involuntary manslaughter. A pre-trial hearing on the insanity defense was held on October 3, 1991 and another pre-trial hearing was scheduled and held on October 4, 1991, on all the other issues, includ-

ing more arguments on the insanity defense. The court's conclusions are stated herein.

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. *Notice of the Insanity Defense*

Less than one week prior to the start of his trial, defendant Henry Knight gave notice to this court and the government of his intention to rely on an insanity defense. At a pre-trial hearing on the issue of the belatedly filed notice of the insanity defense, counsel for defendant submitted that the late filing was due to newly discovered evidence. Defense counsel tendered the following: that counsel first learned from the defendant, on September 27, 1991, that he had been seeing a psychiatrist. This was on Friday preceding the Monday, September 30, 1991, filing of the notice of intention to rely on the insanity defense. Trial was scheduled for October 7, 1991. The record indicates that trial of this matter has been delayed for a multitude of reasons, including a plea of guilty, several changes of counsel by defendant, withdrawal of the guilty plea, political aspirations of the defense counsel and a continuance on the advent of the birth of the prosecuting attorney's child. At the first hearing, some dispute existed between the parties as to whether a previous trial date was set for August 7, 1991, dependant only on the availability of a judge. The court's review of the record shows that since the first trial date of October 22, 1990, due to the many delays trial of this matter was not scheduled until on or before September 10, 1991, when the current trial date was set. See Docket No. 63.

At the first hearing, counsel for the defense argued that no deadline for pre-trial motions had been set prior to the current trial date. The prosecution contended that a trial date had been scheduled for early August 1991. The record shows that a calendar call, which Magistrate Resnick explained is for "the purpose of assigning trial dates" (See Magistrate Resnick's letter of October 3, 1991), was scheduled for this matter on Wednesday, July 10, 1991. At that time a trial date of August 5, 1991, was proposed. Sometime, on or before September 10, 1991, the current trial date of October 7, 1991, was set.

After the pre-trial hearing on October 3, 1991, a letter from Magistrate Judge Resnick, submitted to the Court later that day, provided explanation for the lack of cut-off dates in this case. That letter explained that "cut off dates are usually set at any arraignment" on the

superseding information but in this case the arraignment was held on September 26, 1991, eleven calendar days before trial. In his letter the Magistrate noted that since the trial date was set prior to the arraignment date, no new cut off dates were given "nor were any requested by either party."

At the second pre-trial hearing, counsel for defense again argued that its motion, filed seven (7) calendar days before trial, was not untimely since no pre-trial deadlines had been set for the current trial date. At that point, it was conceded by all the parties that no pre-trial motion deadline was set prior to this trial date.

## B. *Federal Rule of Criminal Procedure 12.2*

Federal Rule of Criminal Procedure 12.2(a)[1] requires that a defendant notify the government and the court if he or she intends to "rely upon the defense of insanity at the time of the alleged offense, . . ." The notice must be given during the time prescribed for the filing of pre-trial motions but may be given later if the court finds cause for delay. If a defendant fails to comply with the time requirements, "insanity may not be raised as a defense."

### 1. *Deadline for Pre-Trial Motions*

Because no motion cut off date was set, the court must decide whether defendant's filing of the notice of intention to rely on the insanity defense was reasonably timely within the factual context of this case. In light of the history of this case and all the surrounding circumstances, the court finds that notice of less than four (4) full business days before trial is unreasonable. Defendant contends that the court should permit his defense of insanity since it is raised on newly discovered evidence. He argues that because he is unschooled in the law he did not know the legal significance of his interviews[2] with Dr. Hendricks. That is, he did not realize that there was a defense in these visits until he mentioned them to his attorney.

Even if the court accepts the defendant's contentions, to say that defendant's motion is timely, it would necessitate a delay in trial in order to give the government time to meet expert testimony and

---

[1] Title 5 V.I.C. App. 2, R.12.2 specifically adopts the F. R. Crim. P. 12.2.

[2] Counsel for defendant stated that the first two interviews with Dr. Hendricks occurred in an informal setting and were not scheduled visits, that is, by appointment. Counsel explained that it is not typical for the West Indian male to see psychiatrists nor would they normally be found on a psychiatrist's couch.

prepare for the defense. It is just such delays that the notice provisions of Rule 12.2 were intended to obviate.

> Rule 12.2 is designed to require a defendant to give notice prior to trial of his intention (1) to rely upon the defense of insanity or (2) to introduce expert testimony of mental disease or defect on the theory that such mental condition is inconsistent with the state required for the offense charged. . . . The objective is to give the government time to prepare to meet the issue, which will usually require reliance upon expert testimony. Failure to give advance notice commonly results in the necessity for a continuance in the middle of trial, thus unnecessarily delaying the administration of justice.

See Notes of Advisory Committee On Rules, Fed. R. Crim. P. 12.2. In United States v. Veatch, 647 F.2d 993 (9th Cir. 1981) the Ninth Circuit upheld the trial court's preclusion of the insanity defense, where notice was given one day before trial. There also, no pre-trial motion deadline was set by the court, but local rule operated to establish a deadline.

■ The rule further states, that the court "may for *cause shown* allow late filing of the notice or grant additional time to the parties to prepare for trial or make such order as would be appropriate." In addition, 12.2(d) states that "[i]f there is a failure to give notice as required . . . the court may exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's guilt." Together the provisions of rule 12.2 give the court the discretion to take such action as may be appropriate under the factual circumstances of the individual case. See at 1002–03; accord, United States v. Duggan, 743 F.2d 39, 80 (2d Cir. 1984).

■ In a leading decision on this issue, the Second Circuit in United States v. Duggan, said that "'[c]ause' consists not only of the explanation of the belatedness of the party's action, but also of a showing of some merit in the position belatedly advanced." 743 F.2d at 80. Counsel for defendant contends that this is newly discovered evidence. This explanation strains the court's credibility. The record shows that counsel had at least nine months to discover evidence, if any, of defendant's mental disorder.[3] In addition, from the arguments

---

[3] At the pretrial hearings, defendant was represented by Amelia Joseph, who first appeared on behalf of the defendant February 8, 1991, about the time the de-

at the pre-trial hearing and the record it may be adduced that this case was ready for trial as early as July 1991. It is difficult for the court to overlook the unavoidable inference that counsel is engaging in dilatory tactics. This case was initially set for trial almost a year ago. Most of the delays that have occurred may be attributed to defendant. Judicial economy, especially in this jurisdiction, is a critical consideration. The court must also consider the public interest in the speedy disposition of cases on its docket.

C. *Foundational Relevance of the Insanity Defense*

■■ Again, accepting defendant's contentions as true, the court is required to test the foundational relevance of the insanity defense, that is, the merit of the insanity defense. The law is that a defendant is presumed sane or "in sound mental health," until the introduction of evidence of insanity dispels the presumption; once evidence of insanity is introduced, then "sanity like any other fact must be proved as part of the prosecution case beyond a reasonable doubt." United States v. Currens, 290 F.2d 751, 761 (3rd Cir. 1961); Government of the Virgin Islands v. Webbe, 821 F.2d 187, 189 (1987). Under Virgin Islands law and the law of this circuit, in order to raise the issue of insanity a defendant must make a minimum showing. In this threshold showing defendant's evidence must make out a prima facie case of insanity at the time the crime was committed.

■ The substantive insanity defense test in this jurisdiction "requires both a mental illness and a causal connection between that illness and the acts committed." See Webbe, 821 F.2d at 189. This threshold burden placed on the defendant is one of preliminary relevance, and requires some evidence of a "mental disease or defect" which deprives him of "substantial capacity to conform his conduct to the requirements of the law." See Currens, 290 F.2d at 761; Government of the Virgin Islands v. Fredericks, 578 F.2d 927, 932 (1978). Once defendant meets this initial burden, the burden then shifts to the prosecution to prove beyond a reasonable doubt that the defendant possessed the capacity to refrain from committing the acts with which he has been charged. See Government of the Virgin Islands v. Bellott, 495 F.2d 1394, 1397 (1974), Currens, 290 F.2d at 761.

The dispositive issue here of whether the evidence proffered by the defendant is sufficient to raise the defense of insanity is one gen-

---

fendant filed his motion to withdraw the guilty plea. Ms. Joseph represented defendant as local counsel, as defendant again changed counsel, retaining as lead counsel C. Vernon Mason, Esq., from New York.

erally analyzed under both substantive and procedural-evidentiary tests. There are two tests within the circuits utilized by courts in determining whether a defendant has produced sufficient evidence to raise a defense in a particular case. One, is the judge-made test of Frye v. United States, 293 F.1013, 1014 (D.C. Cir. 1923), applied in States v. Lewellyn, 723 F.2d 615, (8th Cir. 1983) whether evidence of a compulsive gambling disorder could not be considered as the basis for an insanity defense to charges of embezzlement, false statements and mail fraud. Two, the foundational relevance test based on Fed. R. Evid. 401, applied by the Second Circuit in United States v. Torniero, 735 F.2d 725 (2d Cir. 1984) (Upholding the district court's exclusion of the proffered evidence of a compulsive gambling disorder as basis of insanity defense to theft-type criminal offenses). The Third Circuit rejected the Frye approach. See United States v. Downing, 753 F.2d 1224, 1237 (1985). Thus, the question at issue must be properly addressed under the Second Circuit approach as one of foundational relevance pursuant to Fed. R. Evid. 401.

In deciding whether the defendant has met his preliminary burden, the court must determine whether: (1) adjustment disorder is a mental disease or defect within the meaning of Virgin Islands criminal insanity rule; (2) whether there exists a sufficient nexus between the alleged disease of adjustment disorder and the crime charged; and (3) whether a person suffering from adjustment disorder with disturbance of conduct *lacks substantial capacity to conform his conduct to the requirements of the law.* [Emphasis Added].

### 1. Criminal Definition of Mental Disease of Defect

Under Virgin Islands law "[a]ll persons are capable of committing crimes or offenses except . . . persons who are mentally ill and who committed the act charged against them in consequence of such mental illness." 14 V.I.C. § 14(4) By legislative and judicial fiat[4] the Vir-

---

[4] The revision note of 14 V.I.C. 14(4) states in part

This change was suggested by the Honorable John Biggs, in a letter to the Chairman of the Advisory Committee dated July 19, 1956, and the change was concurred in by the Honorable Albert B. Maris, Judge of the United States Court of Appeals for the Third Circuit and member of the Advisory Committee.

Five years later Judge Biggs in United States v. Currens, 290 F.2d 751 (3d Cir. 1961) established the insanity standard of the Third Circuit "which is in essence identical to the ALI formulation." See Government of the Virgin Islands v. Fredericks, 578 F.2d 927, 942 (1978) (Adams, Circuit Judge, dissenting) (In agree-

gin Islands definition of mental illness or defect is the same as stated by the American Law Institute (ALI). The text is as follows:

> The term mental disease or defect do[es] not include an abnormality manifested by repeated criminal conduct or otherwise anti-social conduct.

To make this required minimum showing, defendant at the first hearing introduced as an exhibit the Diagnostic and Statistical Manual of Mental Disorders (3d. ed 1980) (DSM-III). Defense made the claim that at the time the act was committed he was suffering from "adjustment disorder". At the second hearing, defendant submitted a psychiatric report from Dr. Hendricks, which clarified defendants mental disorder as "adjustment disorder with disturbance of conduct." See Psychiatric Report, p.2.

DSM-III lists the diagnostic criteria for Adjustment Disorder as:

> A. A maladaptive reaction to an identifiable psycho-social stressor, that occurs within three months after the onset of the stressor.
>
> B. The maladaptive nature of the reaction is indicated by either of the following:
>
> 1. *impairment* in social or occupational functioning
>
> 2. symptoms that are in *excess of a normal and expectable reaction* to the stressor.

*    *    *

See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p.299–302 (3rd. Ed. 1980). Adjustment disorder with disturbance of conduct as defined in DSM-III is to be "used when the predominant manifestation involves conduct in which there is violation of the rights of others or of major age-appropriate societal norms and rules". As stated in DSM-III examples of this disorder include "truancy, vandalism, reckless driving, fighting, defaulting on legal responsibilities.

▮ The language of DSM-III does not establish that "adjustment disorder" is within the meaning of "mental defect or disease" as defined by the ALI and the Virgin Islands. Fredericks, 578 at 532. An "impairment" or "symptoms in excess of normal and expectable

---

ment, the majority opinion in Fredericks, "[i]nstead of attempting to define more closely the term "mental disease or defect" both the Institute (ALI) and this court departed from Durham)."

reaction" do not constitute a mental defect or disease that would result in "a *substantial lack of capacity* to conform one's conduct to the requirements of the law. But the rule is that the defendant has met his burden by showing "some evidence of insanity" or irresponsibility under the law. See Bellott, 495 F.2d at 1397 (The court must determine whether there is some evidence (of insanity)). In this case, Knight depends on the report by his expert, Dr. Hendricks to establish this minimum showing.

Dr. Hendricks stated in the psychiatric report that defendant's actions when he "lost control of his impulses to 'kick the shit' out of" deceased were "more than just revenge or even a fit of rage." Dr. Hendricks further stated that the defendant is "insecure psychosocially" and listed "psychodynamics" such as the defendant's "newly found world" which was "upwardly mobile" and one of "social prominence" in support of this contention. Dr. Hendricks stated that his conclusion is based on "entities . . . not to be found in the DSM's (sic)." He continued, "[t]hey are not in the psychiatric text books, but these are real, everyday, well known psychosocial mechanisms at work in many black communities, especially smaller communities." Dr. Hendricks then advanced the proposition that defendant Mr. Knight "was out of touch with reality when he pistol whipped (the deceased). He could not stop himself. It was not simply a matter of anger on revenge. It was an exaggerated brief psychotic episode . . ."

In this initial determination, the court must assess whether Dr. Hendricks' conclusions as an expert psychiatric witness provide some evidence so as to raise the defense of insanity. The question is did Dr. Hendricks' report create a reasonable doubt as to whether the defendant "possessed capacity of choice and control, i.e. capacity to conform his conduct to society's standard." See Currens, 290 F.2d at 774. There are no clinical findings to support the conclusory statements of Dr. Hendricks. He asserts that the other entities upon which he based his conclusions are well-known, despite the lack of documentation in any psychiatric text. Dr. Hendricks based his conclusions on two informal meetings with the defendant, the first supposedly occurring sometime in the same month of the criminal offense, the second in December 1990, approximately four (4) months after the incident, and a third interview which was at the behest of defendant's attorney and which occurred on the same day of the filing of the insanity defense. No additional evaluative information was submitted. The court finds that the defendant's insanity

defense lacks merit. See United States v. Duggan, 743 F.2d 59, 80 (2d Cir. 1984) (the Second Circuit upheld the trial court's denial of a late filing of the insanity defense on a motion which was filed more than 45 days before the second scheduled date of trial. The Second Circuit panel found in its review of the record that the defendants "did not meet their burden of establishing cause sufficient to permit their late filing of their insanity defense)." See also United States v. Veatch, 647 F.2d 995, 1002–3 (9th Cir. 1981) (Trial court preclusion of insanity defense filed one day before trial upheld, pursuant to 12.2(a) despite district court's denial of defendant's motion to show cause. In that case also, no pre trial motion deadline was set by the court, but the applicable deadline was provided by local rule). Moreover, DSM-III does not categorize "adjustment disorder" as the type of incapacitating psychiatric disorder recognized under Virgin Islands law that deprives an individual of substantial capacity to control his acts. The causal link between the mental illness and the charged offense has not been established. The court concludes that defendant has failed to meet his preliminary burden of demonstrating some evidence of insanity.

For the reason set forth above defendant's motion to assert an insanity defense is denied. In so far as defendant's motion for reconsideration is concerned, the court will issue its opinion later today, and before the opening statements.